IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 114,897
114,898

STATE OF KANSAS,
*Appellant*,

v.

DAVID G. LUNDBERG
and
MICHAEL L. ELZUFON,
*Appellees*.

SYLLABUS BY THE COURT

1.

As provided in K.S.A. 17-12a610(a), Kansas has jurisdiction under the Kansas Uniform Securities Act (KUSA), K.S.A. 17-12a101 et seq., to prosecute a defendant for acts related to the sale of a security only if the offer to sell or the sale was made in Kansas.

2.

Sales of a security can involve a continuing process, including steps such as paying consideration, notifying the purchaser the offer has been accepted, and delivering the security. If any step occurs in Kansas, Kansas has jurisdiction under the KUSA.

3.

The KUSA defines "offer to sell" more broadly than that concept is understood in contract law or under the Uniform Commercial Code. An offer to sell a security can occur only once or multiple times in the sales or negotiation process or in a way where more than one offer is extended during the sales process of a single security.

1

4.

Even under the expansive reading permitted by the definition of "offer to sell" in the KUSA, Kansas' jurisdiction is statutorily limited to situations in which the offer originates within the territorial boundaries of Kansas. This is true no matter whether the offer to sell is an attempt or a solicitation, no matter how early in the process it occurs, and no matter whether it is just one of several steps.

5.

Jurisdiction arises under the KUSA only if an offer or sale occurred in the state—not only because the transaction has some sort of nexus to the state.

Review of the judgment of the Court of Appeals in 53 Kan. App. 2d 721, 391 P.3d 49 (2017). Appeal from Sedgwick District Court; BENJAMIN L. BURGESS, judge. Opinion filed July 19, 2019. Judgment of the Court of Appeals reversing the district court is reversed. Judgment of the district court is affirmed.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause, and *Thomas E. Knutzen*, deputy director of policy and senior staff attorney, and *Joshua A. Ney*, *Ryan A. Kriegshauser*, and *Christopher D. Mann*, of the Office of the Kansas Securities Commissioner, and *Derek Schmidt*, attorney general, were with him on the briefs for appellant.

*David L. Miller*, of Ney, Adams & Miller, of Wichita, argued the cause, and *Richard Ney*, of the same office, was with him on the briefs for appellee David G. Lundberg.

*Kurt P. Kerns*, of Ariagno, Kerns, Mank & White, LLC, of Wichita, argued the cause and was on the briefs for appellee Michael Elzufon.

*Zachary T. Knepper*, deputy general counsel, and *A. Valerie Mirko*, general counsel, North American Securities Administrators Association, Inc., of Washington, D.C., and *Alan V. Johnson*, of

Sloan, Eisenbarth, Glassman, McEntire & Jarboe, LLC, of Topeka, for amicus curiae North American Securities Administrators Association, Inc.

PER CURIAM: The State filed many criminal charges of selling or offering to sell unregistered securities and committing fraud in selling or offering to sell securities against Minnesota residents David Lundberg and Michael Elzufon. Lundberg and Elzufon, as principals for Kansas limited liability corporations, sold what the State alleges to be securities by using intermediaries who resided in California. These California intermediaries made sales presentations in California and sold the securities from California to individuals who did not reside in Kansas.

In this appeal, we must determine whether the Kansas Uniform Securities Act (KUSA), K.S.A. 17-12a101 et seq._,_ allows Kansas courts to exercise jurisdiction over the criminal charges against Lundberg and Elzufon. Jurisdiction to prosecute the criminal charges depends on whether "the offer to sell or the sale [was] made in this state or the offer to purchase or the purchase [was] made and accepted in this state." K.S.A. 17-12a610(a). Considering the facts as stipulated to by the parties, we hold neither an offer to sell nor a sale of securities occurred in Kansas.

## FACTS AND PROCEDURAL HISTORY

Lundberg and Elzufon formed Real Development Corp., a Minnesota corporation they registered to do business in Kansas. They formed the corporation to develop properties in downtown Wichita. They were the officers, sole shareholders, and agents during its existence. Real Development maintained places of business in Minnesota and Kansas.

Lundberg and Elzufon also formed four Kansas LLCs. Lundberg and Elzufon were the sole members of each, and they acted as the managers and agents of the LLCs.

3

These LLCs conducted substantial operations from Real Development's place of business in Minnesota, although Lundberg and Elzufon often acted for these businesses while in Kansas and they maintained a place of business in Kansas. The Kansas LLCs issued promissory notes and membership interests. The State alleges these notes and membership interests—representing the buyers' investments—are securities under the KUSA.

Lundberg and Elzufon recruited California intermediaries who were responsible for finding investors. In return, the intermediaries received a percentage of the sale price of any security sold as a result of his or her efforts. These California intermediaries hosted real estate seminars and roundtables in California at which they made presentations. From Minnesota, Lundberg and Elzufon provided some information and materials included in these presentations, but the intermediaries prepared the actual presentations. One intermediary formed his own LLC for the purpose of selling the investment.

Each investor's first contact was through a California intermediary, but the investors also received binders of materials from either the Kansas LLCs, Real Development, or both. None of these materials were sent from Kansas. Investors purchasing securities issued by the Kansas LLCs wired funds to bank accounts in Minnesota. All the investors whose claims are at issue were located outside Kansas when they accepted the offers at issue. All but one investor was a California resident; the one exception was a Colorado resident. Lundberg, Elzufon, or both, while in Minnesota, signed the documents reflecting the transactions at issue.

The State, in separate but identical complaints, charged Lundberg and Elzufon with 61 counts. In one count, the State alleged Lundberg and Elzufon violated K.S.A. 17-12a501(3), which makes it illegal to commit fraud or deceit when offering, selling, or

4

purchasing of a security. The State alleged Lundberg and Elzufon committed "a fraud on at least 60 persons, . . . resulting in a loss of at least $1,000,000 or more." The State also charged six counts of selling an unregistered security under K.S.A. 17-12a301. In the remaining 54 counts, the State charged Lundberg and Elzufon with violating K.S.A. 17-12a501(2), which makes it illegal to make a false statement of a material fact or to omit a material fact when offering, selling, or purchasing a security.

Lundberg and Elzufon filed separate motions to dismiss for lack of jurisdiction, arguing neither the offers to sell, the sales, the offers to purchase, nor the purchases were made or accepted in Kansas. Instead, according to Lundberg and Elzufon, the sales and offers to sell at issue in this appeal took place in California and the sales and offers to sell were between the individual investors and one of the intermediaries, not Lundberg or Elzufon. In contrast, the State contended that the "offer" came from the various "issuers"—the Kansas LLCs—rather than from one of the intermediaries. Because the issuers were Kansas entities, the offer originated from Kansas, supporting territorial jurisdiction in Kansas. According to the State, the Legislature intended this outcome because it wanted to prevent the state from being used as a base for fraudulent activity.

The district court judge granted the motion to dismiss 56 of the counts—the counts related to the sales involving the California intermediaries. The district judge found that jurisdiction over these counts turned on the identity of the offeror. He relied on the Black's Law Dictionary 1081 (6th ed. 1990) definition of "offer" as "to present for acceptance or rejection" and concluded the California intermediaries, acting in California, were the ones presenting the sale of the investments for acceptance or rejection. He also emphasized the offers made by one intermediary that purported to be made by that intermediary's investment LLC rather than any of the Kansas LLCs or Real Development. The district judge rejected the State's argument that any of the offers originated within

Kansas. After this ruling, the State voluntarily dismissed the remaining charges to appeal the district judge's decision rejecting territorial jurisdiction over the 56 remaining counts.

A panel of the Court of Appeals reversed. *State v. Lundberg*, 53 Kan. App. 2d 721, 733, 391 P.3d 49 (2017).

The panel analyzed the jurisdictional question applying language from *Lintz v. Carey Manor Ltd.*, 613 F. Supp. 543, 550 (W.D. Va. 1985), and *Newsome v. Diamond Oil Producers, Inc.*, CCH Blue Sky L. Rptr. ¶ 71,869 (Okla. Dist. Ct. 1983). The panel noted that in *Newsome*, an Oklahoma state court held "that a sale or offer to sell a security originates from a state if '*any portion of the selling process*' has occurred within the state." *Lundberg*, 53 Kan. App. 2d at 730. The panel also relied on a statement from *Lintz* that "'so long as there is *some territorial nexus to a particular transaction*, the [security] laws of two or more states may simultaneously apply.'" *Lundberg*, 53 Kan. App. 2d at 730 (quoting *Lintz*, 613 F. Supp. at 550).

The panel held that the sales originated in Kansas and thus Kansas had territorial jurisdiction. The panel emphasized Lundberg and Elzufon formed Kansas LLCs to raise funds to revitalize properties in downtown Wichita. The panel noted some promissory notes and membership interests included Kansas choice-of-law clauses and some LLCs' operating agreements contained forum-selection clauses designating federal or state courts in Sedgwick County. The panel also emphasized Lundberg's and Elzufon's other Kansas contacts not directly related to the offers of sale or sales at issue. See 53 Kan. App. 2d at 732.

We granted Lundberg's and Elzufon's petitions for review, providing our jurisdiction under K.S.A. 60-2101(b).

ANALYSIS

Lundberg and Elzufon argue the Court of Appeals erred because Kansas courts lack jurisdiction to pursue criminal charges against them under the KUSA. They cite K.S.A. 17-12a610(a), titled "Jurisdiction; Sales and offers to sell" and providing that K.S.A. 17-12a301and 17-12a501, among other statutes, "do not apply to a person that sells or offers to sell a security unless the offer to sell or the sale is made in this state or the offer to purchase or the purchase is made and accepted in this state."

*Standard of review*

This issue of jurisdiction presents a question of law over which we exercise unlimited review. *State v. Rupnick*, 280 Kan. 720, 741, 125 P.3d 541 (2005).

To determine whether jurisdiction exists, we must interpret the KUSA. Statutory interpretation is also a question of law subject to unlimited review. We begin our analysis with the touchstone of statutory interpretation: legislative intent. The best and safest rule for discerning this intent is the plain language of the statute. Only when the statutory language is unclear or ambiguous do we move on to consider tools of statutory construction. *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 48, 392 P.3d 68 (2017).

*KUSA background*

Kansas has historically been an early adopter of laws regulating securities. It was the first state to adopt a securities act, passing the first such laws in 1911. 12 Blue Sky Law § 1:1 (2018). The purpose of this early law and its successor statutes was "'to place the traffic of promoting and dealing in speculative securities under rigid governmental regulation and control to protect investors, thereby preventing, so far as possible, the sale

of fraudulent and worthless speculative securities.' *Activator Supply Co. v. Wurth,* 239 Kan. 610, Syl. ¶ 1, 722 P.2d 1081 (1986)." *Brenner v. Oppenheimer & Co.*, 273 Kan. 525, 543, 44 P.3d 364 (2002).

Effective July 1, 2005, Kansas adopted the 2002 Uniform Securities Act (USA) promulgated by the National Conference of Commissioners on Uniform State Laws (NCCUSL). See *Klein v. Oppenheimer & Co.*, 281 Kan. 330, 331, 130 P.3d 569 (2006). The purpose of the uniform act, and in turn the KUSA, remains the same as the earlier Kansas statutes. See NCCUSL, Uniform Securities Act, Prefatory Note ("It is not intended that adoption of a new Uniform Securities Act will reject earlier case decisions interpreting identical or substantively identical sections of [earlier acts] unless specifically so stated in the Official Comments."). Uniform laws "are adopted to remove doubts as to controlling rules of law on the subjects involved and are intended to secure not only identity of the statute, but also uniformity in decision." *In re Estate of Reed*, 233 Kan. 531, 540-41, 664 P.2d 824 (1983).

We thus often look to decisions from other courts as persuasive authority when interpreting uniform laws. This can be helpful when, as here, no Kansas case has addressed a statute. On the issue now presented, however, we find no case precisely on point with the facts here. As a result, we focus on the plain language of the KUSA and explore the limited guidance we can glean from the caselaw of other jurisdictions. We thus begin by looking more in depth at the elements of each crime charged, as those crimes are defined in the KUSA.

*KUSA as applied here*

In six counts, the State charged Lundberg and Elzufon with violating K.S.A. 17-12a301 by selling an unregistered security. The KUSA regulates securities by making it

8

unlawful for a person to offer or sell a security in the state unless at least one of three conditions is satisfied: (1) the security is a federally covered security, (2) the security, transaction, or offer is exempt from registration, or (3) the security is registered under the KUSA. K.S.A. 17-12a301; see also K.S.A. 2018 Supp. 17-12a302 (notice filing); K.S.A. 2018 Supp. 17-12a303 (registration by coordination); K.S.A. 17-12a304 (registration by qualification). These provisions apply only if a security is at issue. In their motions to dismiss, Lundberg and Elzufon challenged whether the interests underlying the charges here are securities under the KUSA. See 12A Blue Sky Law § 10:9. The district court did not reach this question and it is not before us. We therefore assume, without deciding, that the notes and membership interests underlying the charges here are securities under the KUSA.

The State also charged Lundberg and Elzufon with many counts of fraud. The antifraud provisions of the KUSA make it unlawful "in connection with the *offer, sale, or purchase of a security*, directly or indirectly" to commit one of three types of fraudulent acts. (Emphasis added.) See K.S.A. 17-12a501. The State charged Lundberg and Elzufon with two of the three possible types of fraudulent acts, specifically those that make it unlawful:

> "(2) to make an untrue statement of a material fact, or omit to state a material fact necessary in order to make a statement made, in the light of the circumstances under which it is made, not misleading; or
>
> "(3) to engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person."

The Legislature has assigned crime severity levels for intentional violations of the registration requirements of K.S.A. 17-12a301 and the antifraud provisions of K.S.A. 17-12a501 based on the amount of loss caused by action. See K.S.A. 2018 Supp. 17-12a508(a)(2), (3).

9

*Jurisdiction under KUSA*

Next, we must consider the interplay of these elements with the KUSA's jurisdiction provision, K.S.A. 17-12a610. The jurisdiction statute divides into two broad categories: Subsection (a) is titled "Sales and offers to sell" and subsection (b) is titled "Purchases and offers to purchase." See K.S.A. 17-12a610(a), (b). The parties here focus on the sales and offers to sell category, apparently conceding that any purchases or offers to purchase were not made within Kansas. We, therefore, limit our analysis to sales and offers to sell. This analysis covers all counts—those charged under both K.S.A. 17-12a301 and K.S.A. 17-12a501—because those statutes encompass sales and offers to sell. As noted earlier, under K.S.A. 17-12a610(a) (jurisdiction), neither K.S.A. 17-12a301 (unregistered security) nor K.S.A. 17-12a501 (fraud) "apply to a person that sells or offers to sell a security unless the offer to sell or the sale is made in this state or the offer to purchase or the purchase is made and accepted in this state." K.S.A. 17-12a610(a).

We thus must determine whether either (a) each sale to an out-of-state resident was made in Kansas or (b) each offer to sell extended to an out-of-state resident by a California intermediary originated in Kansas. Under the stipulated facts, nothing distinguishes the territorial jurisdiction issues of one count from another and thus our conclusion about one count applies to all. We hold on the facts here that the sales were not made in Kansas nor did the offers to sell originate in Kansas. We therefore also consider and reject the Court of Appeals nexus analysis.

*Sales*

In parsing the plain language of K.S.A. 17-12a610 and its focus on sales and offers to sell, an essential first step is to consider the statutory definition of "sale." It includes "every contract of sale, contract to sell, or disposition of, a security or interest in

10

a security for value." K.S.A. 17-12a102. As other courts have applied this definition "a general rule seems to be emerging that holds a sale is considered to have taken place when an investor is required to make an investment decision." 12A Blue Sky Law § 10:6. In private placements, such as those at issue, the sale generally occurs when the seller accepts the investor's subscription agreement. 12A Blue Sky Law § 10:7. But sales of a security can involve a continuing process, involving steps such as paying consideration, notifying the purchaser the offer has been accepted, and delivering the security. 12A Blue Sky Law § 10:7. If any of these steps occurs in Kansas, Kansas has jurisdiction under the KUSA.

We therefore consider the sales processes alleged here to determine whether any step in that process occurred in Kansas. A review of the stipulated facts shows the following activity:  All investment decisions, as reflected by the acceptances of the offered securities, involved in the remaining charges occurred outside Kansas; the Kansas LLCs acceptances were executed outside Kansas; purchases were made by sending funds to Minnesota bank accounts; and paperwork evidencing the sale was signed in Minnesota and sent to investors from somewhere outside Kansas. We see no step in the sales process that occurred in Kansas even though we acknowledge any number of these acts outside Kansas were engaged in by Lundberg or Elzufon on behalf of the Kansas LLCs. For these reasons, we conclude no jurisdiction exists based on a sale occurring in Kansas.

*Offers of sales*

This leaves whether any offer to sell was made in Kansas. Just as we first looked to statutory definitions when considering whether there had been a sale in Kansas, we now consider how the KUSA defines an "offer to sell." That term includes "every attempt or offer to dispose of, or solicitation of an offer to purchase, a security or interest in a

11

security for value." K.S.A. 17-12a102(26). This definition is broad, raising at least three considerations.

First, the words "every attempt" and "solicitation" make the concept of an offer in the securities context broader than it is understood in contract law. As a result, more actions could qualify as an offer under the KUSA than under Kansas law relating to contracts. See 12A Blue Sky Law § 10:3 ("Even the most casual reading of these Sections [regarding offers to sell] indicates that they are much broader than the common-law contracts' definitions of these terms learned in the first year of law school or found in the Uniform Commercial Code."); see also *Kreis v. Mates Inv. Fund, Inc.*, 473 F.2d 1308 (8th Cir. 1973) ("Common law contract concepts, where supplanted by [the Missouri Uniform Securities Act], obviously no longer control in the applicable areas.").

Second, the same words make it "evident that it is extremely easy to make an offer very early in the sales or negotiation process." 12A Blue Sky Law § 10:4. In *People v. Jacques*, 137 Cal. App. 2d 823, 291 P.2d 124 (1955), for example, the court rejected an argument that correspondence was merely an agreement to agree and thus not an offer. "Even an agreement to reach an agreement to sell stock would be, at least an 'offer to sell' which is prohibited." 137 Cal. App. 2d at 832.

Third, more than one offer may occur during the sales process of a single security. Thus, even if an intermediary handles much of the process, jurisdiction may be extended if there is a direct communication between the purchaser and the offering company at any point. A California Corporation Commission interpretative opinion illustrates. The opinion first considered whether a California corporation offering private placements through its wholly owned subsidiary in Washington, D.C., made an offer under California securities law. The D.C. subsidiary contacted potential investors, sent documents, received executed documents, and accepted and received checks in an escrow account in

12

D.C. The Commissioner found no California offer on these facts. But the Commissioner distinguished these facts from those in which an investor reached out to contact the general partner in California. This contact, the Commissioner concluded, was a new offer to which the California Act would attach. See 12 Blue Sky Law § 4:34 (discussing California Corporation Commission Interpretative Opinion No. 81/10C, 11 Cal. Corp. Comm'n Official Op., 1981 Cal. Sec. LEXIS 1 [Nov. 12, 1981]); see also 12 Blue Sky Law § 4:36; 12 Blue Sky Law § 4:33.

In sum, the KUSA defines "offer to sell" more broadly than that concept is understood in contract law or under the Uniform Commercial Code. An offer to sell can occur once or multiple times during the sales or negotiation process of a single security. Each concept theoretically makes it easier for the State to establish jurisdiction.

Moreover, another portion of the jurisdiction statute broadens the potential for jurisdiction over an offer of sale even more. That portion specifies that an offer to sell is "made in this state, whether or not either party is then present in this state, if the offer (1) [o]riginates from within this state; or (2) is directed by the offeror to a place in this state and received at the place to which it is directed." (Emphasis added.) K.S.A. 17-12a610(c). Webster's New World College Dictionary (5th ed. 2016) defines "originate" as a transitive verb meaning "to bring into being; esp., to create (something original); invent," or as an intransitive verb meaning "to come into being; begin; start."

Consistent with the State's argument, the authors of a treatise on Blue Sky Laws explain the reason for this broad grant of jurisdiction arises from a state's interest in preventing its territory from being the base for illegal sales. 12 Blue Sky Law § 4:25. They cite notable examples of states serving as a base for boiler room operations where calls were made all over the country, causing reputational harm to those base states. They emphasize the importance of conferring jurisdiction where the offeror is located because

13

often the securities officers in the offeror's state are better positioned to discover and halt such unscrupulous practices. 12 Blue Sky Law § 4:30.

As the treatise authors discuss, Kansas certainly has an interest in not serving as a base of operations for fraud. But even under the expansive reading permitted by the definition of "offer to sell" in the KUSA, Kansas' jurisdiction does not extend as far as the State argues. Instead, it is statutorily limited to situations in which the offer originates within the territorial boundaries of Kansas. This is true no matter whether the offer to sell is an attempt or a solicitation, no matter how early in the process it occurs, and no matter whether it is just one of several steps. The cases cited in the Blue Sky Law treatise found jurisdiction when the calls—the offers—were made from the geographic territory of the state or when the calls were received within the territorial limits of a state. See 12 Blue Sky Law § 4:24 (citing, e.g., *Shappley v. State*, 520 S.W.2d 766 [Tex. Crim. App. 1974]).

Here, an offer to sell was not made from Kansas—in other words, it did not originate from Kansas—under any of these formulations of the definition. Instead, Lundberg and Elzufon retained agents in another state and those agents made an offer on behalf of the company. The offers originated with the California intermediaries. Documentation or other communication sent on behalf of Real Development or the LLCs that supported the offers, which as discussed above could be interpreted to constitute an offer, was sent from Minnesota, not Kansas. No act comprising the sales offer process that underlies these charges against Lundberg and Elzufon occurred in Kansas. While we recognize the offers were extended on behalf of the Kansas LLCs, we find no support for an interpretation of the KUSA that would allow a Kansas court to exercise criminal jurisdiction only because the entity purportedly benefiting from the security issuance was organized under Kansas law and has a place of business in Kansas when no act in connection with the sale or offer occurred in Kansas.

14

*Nexus*

Even so, the State, Court of Appeals panel, and amicus all rely on *Lintz* and *Newsome* to conclude that Kansas has a sufficient "nexus" to the alleged crimes to invoke Kansas jurisdiction. See *Lundberg*, 53 Kan. App. 2d at 731 ("a sale or offer to sell a security originates in Kansas if any portion of the selling process has occurred here or if there is some territorial nexus between the offer and the State of Kansas"); see also *Lintz*, 613 F. Supp. at 550 (holding many states' securities laws may simultaneously apply to a single transaction; opinion incidentally mentions territorial "nexus"); *Newsome*, CCH Blue Sky L. Rptr. ¶ 71,869 (concluding Oklahoma Act applies "when any portion of the selling process of securities covered by the Act occurs in Oklahoma"). We are not persuaded by these cases because jurisdiction arises under the KUSA only if an offer or sale occurred in the state—not just because the transaction has some sort of "nexus" to the state.

We also conclude the panel of the Court of Appeals erred in its analysis because it confused concepts of constitutional long-arm jurisdiction with the statutory jurisdiction granted by the KUSA. The panel emphasized Lundberg's and Elzufon's contacts with Kansas, noting Lundberg and Elzufon formed the Kansas LLCs to raise funds from investors to develop property in Wichita; the LLCs have places of business in Kansas; the LLCs conducted substantial operations in Minnesota and Kansas; some securities issued by the LLCs include choice-of-law and forum-selection provisions designating Kansas law and Kansas courts for resolving disputes; Lundberg signed a promissory note (one that did not relate to the charges at issue on appeal) while in Kansas; a Wichita investor purchased a promissory note issued by a Kansas LLC, even though the criminal charges based on this transaction had been dismissed before the case reached the Court of Appeals; Lundberg and Elzufon were in Kansas "on multiple occasions"; one intermediary traveled to Wichita to meet Lundberg and Elzufon; and, one time,

15

information about investments was faxed from a hotel in Wichita. 53 Kan. App. 2d at 731-32. The panel then found these contacts substantial enough that Lundberg and Elzufon should have anticipated being brought into court in Kansas.

This type of minimum contacts analysis might satisfy constitutional due process requirements, but it fails to address the statutory language limiting Kansas' jurisdiction over criminal acts arising under the KUSA. See *Merriman v. Crompton Corp.*, 282 Kan. 433, 465, 146 P.3d 162 (2006) (discussing constitutional due process requirements for jurisdiction; nonresident defendant must purposely establish minimum contacts with forum state; requirement of purposeful availment ensures out-of-state defendant will not be hailed into jurisdiction by unilateral acts of another party).

We appreciate the Court of Appeals' and dissenters' inclination to conclude jurisdiction attaches here. In some ways it seems anomalous that Kansas could not exercise jurisdiction over Lundberg's and Elzufon's conduct as principals and shareholders in business entities they knowingly formed or registered to do business under color of Kansas law. They planned to rehabilitate and manage real property in Kansas, maintained Kansas offices, and issued securities for the Kansas LLCs' benefit. We are concerned this result encourages the unscrupulous to form enterprises under Kansas law, then scrupulously avoid taking any step in the sales or offer process in Kansas to avoid our jurisdiction—particularly in this time when working from anywhere as long as one has a phone and a computer is a common occurrence. But the KUSA is designed to punish the acts taken as part of the sales or offer of a security within the territorial boundaries of Kansas. And here, all of those acts, according to the stipulated facts, occurred outside Kansas. Criminal enforcement, if there is to be any, must lie in one of the jurisdictions in which Lundberg's and Elzufon's actions allegedly occurred.

Judgment of the Court of Appeals reversing the district court is reversed. Judgment of the district court is affirmed.

STEGALL, J., not participating.

JAMES F. VANO, District Judge, assigned.[1]

* * *

VANO, J., concurring: The posture of the case before the court is somewhat different from most criminal appeals. The district court began a preliminary hearing in November 2015. After two days of testimony, the State agreed with Lundberg and Elzufon to a set of stipulated facts to be used in deciding defendants' motions to dismiss for lack of jurisdiction. In addition to the stipulations, the parties agreed that "the Court may consider other evidence received thus far in the Preliminary Hearing in these matters" when ruling on the motion. But, "[t]o the extent the evidence thus far in the Preliminary Hearing conflicts with the stipulations herein, the stipulations shall be controlling."

The stipulations, 20 in number, address the existence of various Kansas LLCs, places of business, choice of law provisions, forum selection clauses, the issuance of promissory notes, and the signature on a single promissory note as well as the purposes for the offerings. The only stipulations regarding meetings and conference calls with

---

[1]**REPORTER'S NOTE:** District Judge Vano was appointed to hear case No. 114,897 and 114,898 vice Justice Stegall under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.

potential investors that might come close to insinuating solicitations or "offers" to sell securities were in California, with perhaps one in Colorado. There is no stipulation regarding the place where any offer to sell originated. That is the watershed issue before this court.

There are four principles that guide my thinking and compel this concurrence: First, the traditional separation of powers and role of the judicial branch to lend stability and predictability to the law so that all may guide their conduct and avoid disputes, see Holmes, *The Path of the Law*, 10 Harv. L. Rev. 457 (1897); second, concepts of due process and equal protection embodied in the doctrine of stare decisis and rational bases for distinguishing precedent, see *Lambert v. People*, 355 U.S. 225, 78 S. Ct. 240, 2 L. Ed. 2d 228 (1957); third, the role of the Legislature to define crimes in Kansas, *State v. Rodriguez*, 305 Kan. 1139, 1154, 390 P.3d 903 (2017); and, fourth, the rule of lenity or strict construction of our penal statutes. *United States v. Bass*, 404 U.S. 336, 348, 92 S. Ct. 515, 30 L. Ed. 2d 488 (1971); *State v. Sexton*, 232 Kan. 539, 542-43, 657 P.2d 43 (1983).

The appellant raised three issues for appeal. Two issues had to do with the definitions of "sale" and "offer to sell" occurring or originating in Kansas. The third issue was to address whether "multiple sales" were consummated in Kansas.

At a preliminary examination generally, the State does not have to show proof beyond reasonable doubt or introduce all of its evidence. It is required only to show probable cause that a felony occurred, here in Sedgwick County, Kansas, and that the defendants each committed the felony charged in order to be bound over for trial. In reviewing dismissals at the close of preliminary examination, the evidence is usually viewed in the light most favorable to the State. *State v. Washington*, 293 Kan. 732, 733-34, 268 P.3d 475 (2012). However, on the motion to dismiss for lack of jurisdiction now

18

before the court, the question of law for our review is presented on stipulated facts that the parties agreed to be controlling.

While the court may be offended personally or feel that the greater moral force has been disturbed through the infliction of over $1 million in harm, that is no excuse for us to write a crime that the Legislature did not create. "[I]t is the Kansas Legislature that establishes what constitutes a criminal act in Kansas, not the courts." *Rodriguez*, 305 Kan. at 1154 (citing *State v. Sexton*, 232 Kan. 539, 542-43, 657 P.2d 43 [1983]). While the court may be called upon to review whether a statute passes constitutional muster or whether a certain set of facts fits the proscribed conduct, or whether a statute charges a crime at all, it should never create the crime to fit the facts. Whenever a court expands a statute it presumes to say the expansion is constitutional and forecloses future litigants in the adversarial process from bringing issues we cannot now fathom or divine—blinded by our own creation—before the court. "Much as we might desire to do so, it is not our function to create a crime where the legislature has not done so." *Sexton*, 232 Kan. at 544. "[T]here are no common-law offenses [in Kansas], and there can be no conviction except for such crimes as are defined by statute." *State v. Young*, 55 Kan. 349, 356, 40 P. 659 (1895).

The court's creation of a crime here would be as unconstitutional as any prohibited ex post facto law. "Indeed, an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law, such as Art. I, § 10, of the United States Constitution forbids." *Bouie v. City of Columbia*, 378 U.S. 347, 353, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964). "If a state legislature is barred by the Ex Post Facto Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction." *Bouie*, 378 U.S. at 353-54.

In *Bouie*, the Supreme Court held 6-3 that a South Carolina Supreme Court ruling unconstitutionally deprived the criminal defendants of due process. Justice Brennan wrote the majority opinion, determining that the South Carolina Supreme Court's decision was akin to an ex post facto law. The decision in question construed a statute prohibiting entry onto the lands of another after notice not to enter as prohibiting the act of remaining on the premises after being asked to leave. The South Carolina decision affirmed the conviction of African-Americans who refused to leave a drugstore, but the Supreme Court reversed.

Here, as recognized by the majority, we must first determine legislative intent. What is the Legislature saying shall be punished by criminal sanction in Kansas? That legislative intent must first be obtained, if possible, from the clear language of the statute. *State v. Brown*, 295 Kan. 181, 193, 284 P.3d 977 (2012); *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 607, 214 P.3d 676 (2009). Then, if the clear language is still ambiguous, we must apply rules of construction. *O'Brien v. Leegin Creative Leather Products, Inc.*, 294 Kan. 318, 331, 277 P.3d 1062 (2012). Those rules of construction include the notion that the construed intent must be constitutional. Either way, we must presume that the Legislature intended to adopt a constitutional act.

Likewise, the evaluation of territorial jurisdiction in this case must be done in a constitutional fashion. This includes adherence to the principles of due process and equal protection. The doctrine of stare decisis is a judicial concept that predates our constitutions. It is the equivalent of minimal rational-basis equal protection. This court applies precedent—controlling and persuasive—arising from similar factual circumstances unless it finds some rational distinction.

20

In interpreting the Kansas Uniform Securities Act (KUSA) provisions at issue in this case, there can be different views on what the terms in the statutes mean, but they cannot be enforced if they are ambiguous. A term or phrase in a statute, contract, or other writing is not automatically ambiguous simply because there is some disagreement regarding its interpretation. *Marshall v. Kansas Med. Mut. Ins. Co.,* 276 Kan. 97, 111, 73 P.3d 120 (2003). But it is helpful to bear in mind at least one of the historic rules of statutory construction in determining how the criminal portions of the KUSA must be interpreted and applied. The primary rule of construction for penal statutes is that they must always be strictly construed against the State and in favor of lenity toward the defendant. *State v. Bishop*, 215 Kan. 481, 483, 524 P.2d 712 (1974).

Moreover, this court should not add to or take away from the clear legislative intent to proscribe certain conduct, unless the court must do so to salvage constitutionality. Such was the case in *State v. Huffman,* 228 Kan. 186, 612 P.2d 630 (1980). The *Huffman* case addressed the issue of grafting a "fighting words" provision into a disorderly conduct statute where it would otherwise be unconstitutional to criminalize words alone. As in *Huffman*, criminal statutes may be *restricted* to preserve constitutionality. But the court must exercise caution not to *expand* criminal statutes given that such statutes are to be strictly construed in favor of the accused. See *Bishop,* 215 Kan. at 483.

The best way to ensure that a criminal statute is not expanded beyond the Legislature's intent is to adhere, wherever possible, to the plain language of the statute. This does not mean the court must always morally agree with the results. Obviously, the solicitation to murder, for example, is morally reprehensible. But as recognized by this court in *Sexton*, it is the Legislature that defines the elements of proscribed conduct, not this court. 232 Kan. 539. In *Sexton*, the court could not take a solicitation and create an "attempted conspiracy" crime. Similarly, the court cannot create a Kansas crime in the

present case merely because it disapproves of the behavior of the defendants or takes issue with the injuries their actions may have caused.

The term "nexus" appears nowhere in the KUSA. It certainly does not appear in the criminal statutes of the KUSA. Most pertinent to the present case, the word "nexus" is not mentioned in K.S.A. 17-12a610, the jurisdiction statute here under consideration. The concept of an action being done "in connection with" the crime of general fraud under K.S.A. 17-12a501 is still controlled by the territorial jurisdiction statute, K.S.A. 17-12a610. Any action must fall within the recognized and intended parameters of that statute to be considered a Kansas crime under the KUSA.

Likewise, merely issuing a security is not the crime before this court. Indeed, there appears to be no requirement that an actual entity issue any security for these criminal sanctions to apply. The corporate entity is not the defendant before the court. That may be a different case with different issues. The corporate entity is a different legal person. Here, the charges are against two individual persons specifically, for selling or offering to sell, and for fraud in those sales or offers, to specific individuals.

Finally, the voluntarily dismissed counts are not ours for consideration. In a similar vein, whether any other jurisdiction can or does decide to prosecute or not is not the issue before us.

The two substantive statutes under which these defendants are charged are, first, the "securities registration" requirement in K.S.A. 17-12a301, and second, the "general fraud" proscription in K.S.A. 17-12a501.

Both of these statutes and all of the factual allegations in the underlying complaint relate to sales, offers to sell, or fraud in the same. All are covered by the criminal penalty

22

statute of the KUSA, K.S.A. 17-12a508. This provision defines the multiple counts charged here as nonperson felony offenses. It further assigns different severity levels and potential prison terms depending on the respective amounts of the alleged loss. None of this is germane to the issue before this court, other than to establish that the underlying allegations were for crimes, not merely civil wrongs.

Again, both of these statutes must comply with the jurisdiction statute in order to be Kansas crimes. K.S.A. 17-12a610 provides, in pertinent part, the following:

"(a) *Sales and offers to sell.* K.S.A. 17-12a301 . . . [and] 17-12a501 . . . , and amendments thereto, do not apply to a person that sells or offers to sell a security unless the offer to sell or the sale is made in this state or the offer to purchase or the purchase is made and accepted in this state.

. . . .

"(c) *Offers in this state.* For the purpose of this section, an offer to sell or to purchase a security is made in this state, whether or not either party is then present in this state, if the offer:

(1) Originates from within this state; or

(2) is directed by the offeror to a place in this state and received at the place to which it is directed."

The problem in this case is that both the Court of Appeals and the dissent want to shoehorn an admittedly offensive fact pattern into this jurisdictional statute to support a Kansas prosecution. But it is simply not covered by the language of the statute.

The Legislature knows the term "issue" when it refers to securities. See, e.g., K.S.A. 17-12a102(17) (regarding issuers). It did not include reference to issuance of unregistered or fraudulent securities in the statutes under which these allegations are brought. It limits the criminal sanction to sales or offers to sell originating within the state.

When it uses the term "originates," it is specifically in regard to the *offer*, and nothing more. A board may decide to issue securities, e.g., in different classes, but restrain the sale or any offering. They may be held for executive bonuses, buyouts, or parachutes. Then again, the proscription against criminal fraud or that regarding unregistered securities could originate within a state—without either party to the sale or offer to sell being present—regardless of the corporate decision to issue. For example, solicitations could be generated here or calls could be routed through a Kansas business office. Furthermore, it seems the offer could be published or broadcast from within a particular state to reach an audience outside of that state and not offend the jurisdictional limitation. K.S.A. 17-12a610(e). There is nothing clearly in the statute that joins origination of a sale or offer to sell to the issuance of a security or the existence of any actual corporate entity here. Mixing the two actions by judicial fiat is akin to legislating a different statute. Again, there is no "nexus" term in the statute on jurisdictional reach. The "origination" is only in regard to the offer to sell. That is the gatekeeper in this case.

If we are going to construe originating a sale to include the formation of a Kansas entity, or a decision of that entity to issue a security, or a solicitation that purports to use proceeds in Kansas, the court might as well not stop there, but fully broaden the scope of our criminal reach and consider that any seller or person who offers to sell unregistered or fraudulent securities anywhere, as long as they happen to have been born in Kansas, should be prosecuted here because he or she—the offeror or the seller—"originated" here. Where would we stop in construing the reach of our statutes?

Sales and offers to sell require at least two parties, hence the reference made to "whether or not *either* party is then present" in Kansas. (Emphasis added.) K.S.A. 17-12a610(c). Thus, an "offer" must be complete such that one can accept it from the other, regardless of how many times it may change before closing. This statute is a specific jurisdictional statute for actions, civil and criminal, under the Kansas version of the

24

securities act. It is unlike the general criminal territorial statute, K.S.A. 2018 Supp. 21-5106, where any part of a criminal enterprise occurring in or directed into Kansas subjects one to Kansas law and penal sanction. *State v. Grissom*, 251 Kan. 851, 889, 840 P.2d 1142 (1992).

Origination has to do with the sale or offer to sell—one party to another—not the issuance of the security or any corporate entity action, purpose, or existence whatsoever. If the Legislature intended a broader jurisdictional reach, it could have just as easily said "had any connection whatsoever to this state, including but not limited to issuance of the security" or even used the word "nexus" in its adaptation of the uniform act's jurisdictional statute. It did not. Indeed, looking to the KUSA as a whole, specifically including issues of publication and broadcasting not directly applicable in this criminal action, it is clear that the Legislature did not try to reach everywhere and every instance of communication to or from Kansas. K.S.A. 17-12a610(e). We must not confuse civil enforcement, state-to-state civil relations, international cooperation, or the construction and purposes of the KUSA overall with the specific concept of criminal enforcement at issue here. Again, penal statutes must be strictly construed.

The Court of Appeals opinion in *State v. Lundberg*, 53 Kan. App. 2d 721, 731, 391 P.3d 49 (2017), does appear to be the only Kansas case to address "originates" in this context. But *Lundberg*'s exclusive focus on a portion of the definition for "originate" is too broadly applied, particularly contrasting it with the concept of "nexus." What the *Lundberg* panel seems to have gotten away from is that the term "originates" refers back to the "offer," not the company behind the offer or representations as to where the proceeds might be used. Looking to the stipulated facts in the present case, the "offers" did not occur or originate in Kansas, they occurred or originated in California, Colorado, Minnesota, or elsewhere.

This seems further true when looking at the concept of "nexus." Black's Law Dictionary 1255 (11th ed. 2017) defines "nexus" as "*n.* (17c) 1. A connection or link, often a causal one." Just on its plain language, "originate," the word the Kansas Legislature actually used, has to mean something different from "nexus," which the Legislature did not use. For an offer to "originate" in Kansas, the offer would have to begin to exist here, be produced here, be initiated here. But for an offer to have a mere "nexus" (i.e., a connection or link) to Kansas seems a far more tenuous connection. In the present case, the offers at issue might seem to have a "nexus" to Kansas, sure, but also California, Minnesota, Colorado, or any number of other jurisdictions. They just did not originate here.

The KUSA, with respect to the sections under consideration, is based upon the Uniform Securities Act, including the very same "originates" provision. The comments to that provision of the Uniform Securities Act indicate the underlying theory to be that the state in which the offer originates should not be used as a "base of operations" for defrauding persons in other states. The comment, not controlling, is broad in its sweep and may be helpful in guiding a civil enforcement. It is just too broad for Kansas criminal application.

Admittedly, many have struggled with the problems caused by dual purpose, i.e.*,* civil regulation and criminal sanction, legislation. See Marx, *How to Construe a Hybrid Statute*, 93 Va. L. Rev. 235 (2007). We have had no problem with civil and criminal distinctions in Kansas thus far. Why would we anticipate any regarding securities? Would we be expecting to allow a criminal defendant in a securities act prosecution to be called by the State as a witness against himself or herself simply because the case is based upon a hybrid statute? Or, would we abandon proof beyond a reasonable doubt or a unanimous 12-person jury verdict simply because the same conduct could be the basis for a lawsuit seeking civil remedies in equity or damages? We have different numbers of

26

peremptory challenges in civil versus criminal trials. And we even have the right to grand jury indictment or a preliminary examination, such as in this case, on a criminal complaint. Although those are not issues before the court upon which we can decide today, they illustrate some distinctions between civil and criminal that did not magically disappear when the Legislature adopted the KUSA. There is no reason here to blend the civil/criminal construction rules and abandon longstanding precedent. Remedial statutes may be liberally read and applied. Criminal or penal statutes must be strictly or narrowly read and applied with lenity toward the accused. The Legislature, not the court, must clearly define what it intends to be criminally sanctioned in Kansas in the first instance.

Indeed, even in civil cases, courts in other jurisdictions have sometimes refrained from interpreting securities act jurisdiction provisions as broadly as the State urges in this case. For example, we consider as illustrative the court's interpretation of a comparably worded New Mexico securities statute, N.M.S.A. § 58-13B-54(C) (repealed 2009) and the California Corporations Code § 25008. See, e.g.*, Genesee Cty. Employees' Ret. Sys. v. Thornburg Mortg. Sec. Tr. 2006-3*, 825 F. Supp. 2d 1082, 1139 (D.N.M. 2011) (recognizing that many of the acts and conduct occurred in substantial part in New Mexico, the offering corporations were headquartered there, and defendants conducted business there, yet finding no jurisdiction); see also *Lubin v. Sybedon Corp.*, 688 F. Supp. 1425, 1460-61 (S.D. Cal. 1988); *In re Activision Sec. Litig.*, 621 F. Supp. 415, 431-32 (N.D. Cal. 1985) (declining to certify a class for claims of certain buyers who purchased publicly traded "over the counter" stock that could be perceived to have "originated" in California but was offered and purchased elsewhere); *Greene v. Horizon/CMS Healthcare Corp.*, No. CIV 97-114JP/DJS, 1998 WL 2030956, at * 8 (D.N.M. 1998). Those other courts found that having headquarters in a state or even transacting a majority of the business in a state is not enough to automatically establish that any offer "originates" from that state.

Kansas courts, in the civil context, have interpreted the KUSA provisions liberally and have recognized that Kansas has a strong interest in regulating securities that emanate from within its borders. Clearly, the Kansas Legislature's use of the term "originates" allows for something beyond the literal in-state contemporaneous presence of an individual offeror and/or offeree. But the "nexus" concept adopted by the Court of Appeals and the dissent takes it too far in the criminal prosecution, extending it beyond "originates" into something far more tenuous, including the precursor actions. For an offer to originate, it must be complete at origination and not simply a thought, precursor, or partial step, but already an "offer" that could be accepted—even if it changes multiple times—in order to offend the KUSA criminal proscriptions.

The Court of Appeals noted that "originate" means to bring into being, create, or start something. *Lundberg*, 53 Kan. App. 2d at 731. The defendants are alleged to have promulgated a speculative or fraudulent security related to Kansas LLCs, and the promotions thereof claimed to be raising funds to spend on some Wichita renewal project.

This construction of the "originates" provision is consistent with a *remedial* purpose of the Act as a whole. That is perfectly fine in the civil enforcement context and regulation of securities. This court has stated that the purpose of the KUSA "was to place the traffic of *promoting* and dealing in speculative securities under rigid governmental regulation and control to protect investors and to prevent, to the extent possible, the sale of fraudulent or worthless speculative securities." (Emphasis added.) *State ex rel. Mays v. Ridenhour*, 248 Kan. 919, 934, 811 P.2d 1220 (1991). Accordingly, to hold that the promotion of information—which eventually results in the purchase of a security in another state—is an "offer" which originated in Kansas would not be inconsistent with the purpose of the Act *in the civil enforcement context*. Such promotion of information would seem to be fairly encompassed by the civil enforcement portions of the Act, at

28

least in cases in which the dissemination of such information was apparently intended to result in the purchase of securities.

Significantly, *Ridenhour*—cited below by the Court of Appeals in this case—was a civil enforcement case, not one launched by a criminal complaint like *Lundberg*. *Ridenhour*, 248 Kan. at 920. Indeed, even the case precedent the dissent relies upon uses civil case rationale. And yet, under Kansas law, a statute prescribing a criminal penalty—as in this case clearly impacting liberty interests of individuals and not merely the regulation of securities—must be strictly construed against the state/government entity seeking to enforce it and in favor of the person against whom it is being asserted. *State ex rel. Stephan v. Pepsi-Cola Gen'l Bottlers, Inc.*, 232 Kan. 843, 846, 659 P.2d 213 (1983); *Bishop*, 215 Kan. at 483.

Here, applying strict construction, or indeed plain reading alone, "offers" made "in this state" or that "originate from within this state" would have to mean just that, without any departure into a "nexus" or "some part of the underlying transaction" analysis. We are not reading anything out of the statute nor are we reading anything into the statute for criminal prosecution. We need only read the words adopted by the Legislature.

Yes, Kansas courts recognize that statutes that are remedial in nature are to be liberally construed. *Smith v. Marshall*, 225 Kan. 70, 75, 587 P.2d 320 (1978); *Byrd v. Kansas Dept. of Revenue*, 43 Kan. App. 2d 145, 153-54 (2010), *aff'd* 295 Kan. 900, 287 P.3d 232 (2012). Indeed, the Court of Appeals rested on *Ridenhour* for the pivotal proposition that "securities acts are remedial legislation." *Lundberg*, 53 Kan. App. 2d at 727 (citing *Ridenhour,* 248 Kan. at 934). But because *Ridenhour* involved a civil enforcement rather than a criminal one, it was not "penal." If the securities statute is being enforced in a penal fashion, as indeed it would seem to be here, it needs to be

strictly construed and narrowly—not expansively—read. Reliance upon *Ridenhour* is misplaced.

Although the dissent is remarkable and nearly persuasive, it still goes too far in adding a penal reach that is not expressed by the Legislature and is inconsistent with Kansas precedent on reading, construing, and applying criminal statutes and sanctions strictly in favor of the accused, and keeping the court out of the business of drafting legislation—particularly penal sanctions.

I agree with the majority and would reverse the Court of Appeals and affirm the trial court.

* * *

LUCKERT, J., dissenting: The majority emphasizes the communications between Minnesotans David G. Lundberg and Michael L. Elzufon and the California intermediaries, who then extended offers to the California investors to conclude no sale occurred nor offer of sale originated in Kansas. In doing so, the majority gives lip service to the history and purpose of Kansas securities laws. Over 100 years ago, Kansas Bank Commissioner J.N. Dolley began to advocate for securities regulation. Over that century-plus, "[t]hat system has matured and become much more complex, but its fundamental nature is the same. One hundred years later, securities regulators 'continue to hold true to Commissioner Dolley's mission to protect citizens from "fakers with worthless stock to sell."'" Fleming, *100 Years of Securities Law: Examining a Foundation Laid in the Kansas Blue Sky*, 50 Washburn L.J. 583, 609 (2011) (quoting *A Century of Investor Protection*, 2010-2011 N. Am. Sec. Administrators Ass'n Ann. Rep. 7). Until today, commentators and historians have recognized that Kansas law allowed the "revolutionary idea of one man to germinate and sprout, ultimately leading to one of the most robust

30

regulatory regimes in the modern economy." 50 Washburn L.J. at 584. Through the majority's holding, after today, it becomes a regulatory regime easily skirted by simply stepping across the state line when performing certain acts on behalf of a Kansas LLC otherwise conducting business in Kansas.

I would not allow this circumvention of Kansas law because I adopt a different view of the transactions at issue from the one taken by the majority. I interpret the offers as originating with and the sales being made by the Kansas LLCs, the only persons offering any investment opportunity. These LLCs acted through their officers and shareholders—Lundberg and Elzufon—to retain the California intermediaries who extended the Kansas LLCs' offers to California investors. Another way to look at it is to say the Kansas LLCs committed the crimes for which Lundberg and Elzufon stand accused. The LLCs are defined as persons by the Kansas Uniform Securities Act (KUSA), K.S.A. 17-12a101 et seq., and as such, the State could charge the LLCs just as their members and officers have been. Cf. *State v. Spencer Gifts*, 304 Kan. 755, 374 P.3d 680 (2016) (involving criminal charges against an LLC for promoting obscenity harmful to minors).

To better understand this position, it is useful to consider some underlying legal principles about business enterprises such as the LLCs here. A limited liability company is a creature of statute, defined as a person by Kansas law. See K.S.A. 2018 Supp. 17-7662 et seq.; K.S.A. 2018 Supp. 17-7663(l) (defining "person" to include a limited liability company); see also Black's Law Dictionary 340 (10th ed. 2014) (defining a "limited-liability company" as "[a] statutorily authorized business entity that is characterized by limited liability for and management by its members and managers, and taxable as a partnership for federal income-tax purposes"). Thus, an LLC may act as a natural person, distinct from its members and within the framework of Kansas LLC law

31

and the LLC's organizing documents. See K.S.A. 2018 Supp. 17-7668; *Matney v. Matney Chiropractic Clinic*, 268 Kan. 336, 341, 995 P.2d 871 (2000).

As a practical matter, criminally charging the LLCs makes little sense here. They no longer exist as going concerns; they cannot be imprisoned; and they apparently no longer hold any assets that could pay fines. But to the extent wrongdoing occurred, it was committed by the LLCs during their existence. An LLC exists only as a legal creation, however. To accomplish anything, an LLC must rely on natural beings—that is, living, breathing people—to act on its behalf. The Kansas LLCs did so here through their members and officers—Lundberg and Elzufon—who recruited the California intermediaries to secure investors for the Kansas LLCs.

To say the offers do not originate in Kansas ignores this practical reality that any offer made starts with the issuer, which is also the entity seeking to benefit from that investment. Here, the Kansas LLCs sought capital for their various development projects in Wichita. People acting on their behalf, first Lundberg and Elzufon, then later the California intermediaries Lundberg and Elzufon recruited, solicited investments in the Kansas LLCs. These solicitations are offers of sales. Although communicated by California intermediaries to California investors, those communications originated with the companies seeking the capital inflow—the Kansas LLCs. And those LLCs had places of business and real property holdings that were the purpose of that business here in Kansas. I, therefore, conclude jurisdiction exists over Lundberg and Elzufon because the subject sales were made in or the subject offers originated in Kansas.

These facts cause this case to fall directly within the reach of the Kansas Uniform Securities Act (KUSA), K.S.A. 17-12a101 et seq. K.S.A. 17-12a610(c) includes within the jurisdiction of Kansas courts any offer to sell "made in this state, whether or not either party is then present in this state, if the offer (1) [*o*]*riginates from within this state*; or (2)

32

is directed by the offeror to a place in this state and received at the place to which it is directed." (Emphasis added.) The offers to sell at issue originated in this state through the actions of the LLCs in Kansas.

This approach dovetails with some of our earliest securities caselaw. In *Daniels v. Craiglow*, 131 Kan. 500, 292 P. 771 (1930), an investor sued three of a company's directors and officers (the president, treasurer, and secretary) after her investment became worthless. In considering who violated Kansas Blue Sky Law, this court held the statute was to be liberally interpreted to prevent fraud. See 131 Kan. at 502. It also noted:

> "The *company sold* shares of its stock to plaintiff. While Smith [the company's director and vice president] conducted the negotiations, he was not seller. The shares were unsubscribed shares, nobody had power to pass title to them except the directors acting as managers of the affairs of the corporation (R.S. 17-608), and the *corporation sold the shares* as principal acting through the directors as agents." (Emphases added.) 131 Kan. at 502.

The sale to the investor was unlawful because it did not comply with statutory requirements for the sale of speculative securities. This court then held the three defendants could be held personally liable to plaintiff for the purchase prices based on their "active participation in the sale," which included accepting the investor's payment and issuing share certificates that two of the directors signed. In addition, "whether or not what defendants did constituted active participation in the sale, their conduct bore such a relation to the unlawful sale they must restore to plaintiff the price she paid for the shares sold to her." 131 Kan. at 503. It, thus, is not unprecedented in Kansas law for officers of a corporation to bear responsibility for a Kansas business' acts that violate Kansas law.

33

This approach best gives effect to the plain language of the KUSA. K.S.A. 17-12a610(c) acknowledges that a sale or offer to sell can be made in a state, "*whether or not either party is then present*" in the state. (Emphasis added.) A treatise acknowledged:

> "Upon first reading, this provision would appear to be meaningless gobbledygook. How could a local statute be held to apply where neither party is present within a state without violating the maxim that state laws, including securities acts, are not to be given extraterritorial effect? However, the meaning and importance of this clause becomes clear when it is realized that the draftsmen have substituted the term 'party' for the normally used term 'principal.' Thus, while neither principal to a transaction may be physically within the state, one or more of the principals may be represented by an agent, who is physically within that state. In these cases, the action of the agent is equivalent to the action of the principal, . . . bring[ing] into play the local statute, without violating the rules against extraterritorial application because the agent or agents are physically present within the state whose law attaches." 12 Blue Sky Law § 4:36 (2018).

Here, the party or principal, the various LLCs, remained in the State. The agent avoided the State while executing relevant documents. But that voluntary absence from the State does not undo the relationship with the Kansas LLCs on whose behalf they acted. Our statute applies to the sale by the Kansas LLCs.

In a case with similar facts, a leading treatise recognized the state of the issuer-seller could have applied its laws. In *Neils v. Black & Co.*, CCH Blue Sky L. Rptr. ¶ 71,017 (D. Or. 1972), an agent in Washington called his client in Oregon about a potential investment in a California company. The Oregon client called the California company and purchased some of its securities. The Washington agent received a commission on the sale. The treatise recognized the *Neils* court applied Oregon securities

34

law but noted it "could also have applied either the Washington or California acts." 12 Blue Sky Law § 4:1.

Here, we have the Kansas LLCs through officers and owners recruiting agents in California to solicit—and in many cases in fact procure—investment in the Kansas LLCs. The Kansas LLCs then issued the investments. Those instruments may have been signed out of state because the Kansas LLCs' officers and owners maintained offices both in Kansas and Minnesota. But their location out of state does not undermine the role of the Kansas LLCs in this transaction. It was those LLCs that recruited others to make the offers that led to the securities transactions at issue. And it was those LLCs that entered the agreements with investors, even if the documents evidencing the transactions were signed outside Kansas. I would find these facts sufficient to say the sales or offers to sell originated in Kansas, and therefore application of Kansas law and jurisdiction is proper.

This is not to say that all sales or offers to sell by a Kansas-registered business entity will necessarily be subject to Kansas securities law and jurisdiction. A New Jersey case demonstrates a reasonable potential limit to such an approach. See *In re Information Resources Corp.*, 126 N.J. Super. 42, 312 A.2d 671 (1973).

There, the New Jersey Bureau of Securities prohibited Information Resources Corp. (IRC) from registering securities or being exempt from registration requirements for a year based on the Bureau's belief that IRC issued more securities than the law allowed in order to qualify for an exemption from New Jersey's registration requirements. IRC began its corporate existence and initially maintained its offices in New Jersey. About a year after its incorporation, IRC moved its offices to New York City. IRC issued a single class of common stock to 20 individuals. Eight purchasers were in New Jersey; 11 were residents of and acquired their shares in New York; and 1 purchaser was in Maryland. The Bureau Chief focused on another time period in which IRC sold shares to

35

17 people, 8 of whom were New Jersey residents. Under New Jersey law, transactions offered to no more than 10 persons in New Jersey were exempt from registration requirements. To bring the transaction within the New Jersey law, the Bureau argued that offers or sales made by the company after its relocation to New York City to persons outside New Jersey occurred in New Jersey based solely on the fact of the company's formation and organization there.

The court rejected the Bureau's position, emphasizing that no part of the sales to New York and Maryland residents involved offers, acceptances, and completed sales that occurred in New Jersey. See 126 N.J. Super. at 48-49. The court found only eight or nine transactions occurred in New Jersey, and thus the securities fell within the New Jersey registration exemption. The court reversed the Bureau's prohibitions on IRC. See 126 N.J. Super. at 50.

Our case is distinguishable from *In re Information Resources Corp.*, however. This is not a case in which the only connection between the LLCs and Kansas is the fact of their business formation under our laws. Rather, this is a case in which the very purposes for these entities' existence was the revitalization of real property in downtown Wichita. And to fulfill that purpose, the LLCs maintained a principal place of business in Kansas as well as Minnesota and issued securities to raise capital. Any other interpretation leads to the exact problem the majority identifies—Kansas becomes a preferred location for the unscrupulous.

Lundberg argued on review that application of our securities law to him would violate the dormant Commerce Clause of the United States Constitution. He relies on three cases for that proposition: *Morrison v. National Australia Bank, Ltd.*, 561 U.S. 247, 130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010); *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S. Ct. 2629, 73 L. Ed. 2d 269 (1982); and *In re National Century Financial Enterprises,*

*Inc.*, 755 F. Supp. 2d 857 (S.D. Ohio 2010). I find these cases distinguishable and therefore conclude the dormant Commerce Clause does not bar application of Kansas law here.

In *National Century*, securities purchasers filed a civil action alleging National Century and others engaged in fraud. National Century and its subsidiaries, all of which were Ohio corporations, issued notes that Credit Suisse, as National Century's "agent and financial advisor in connection with the marketing" of the notes would purchase at a discount. *National Century*, 755 F. Supp. 2d at 861. Credit Suisse, a Delaware corporation with its principal place of business in New York, would then use a placement agent to resell the notes to institutional buyers. Credit Suisse's closings and note deliveries occurred in New York. When National Century collapsed, the institutional noteholders alleged fraud as well as other violations of the Ohio Securities Act. The Noteholders argued Credit Suisse was a joint seller of the notes and liable secondarily because it "'participated in or aided the seller in any way in making such sale.'" 755 F. Supp. 2d at 860-61.

The federal district court hearing *National Century* noted it had to follow *Federated Mgmt. Co. v. Coopers & Lybrand*, 137 Ohio App. 3d 366, 738 N.E.2d 842 (2000), in which an Ohio state court had interpreted Ohio's security law to apply to "a securities transaction between a non-Ohio seller and non-Ohio buyer, so long as the issuer is from Ohio and the seller has 'significant contacts' with the issuer." But the *National Century* court noted "a different question is whether the Commerce Clause permits" its application. 755 F. Supp. 2d at 875. Credit Suisse had argued applying the Act violated the Commerce Clause, specifically the extraterroriality principle, which "'precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State.'" 755 F.

Supp. 2d at 875 (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43, 102 S. Ct. 2629, 73 L. Ed. 2d 269 [1982] [plurality opinion]).

The *National Century* court reviewed the approaches to the Commerce Clause inquiry used in *MITE* and *CTS Corp. v. Dynamics Corp. of America.,* 481 U.S. 69, 107 S. Ct. 1637, 95 L. Ed. 2d 67 (1987). The court highlighted language from *CTS* emphasizing the role of state law in authorizing or creating business entities:  "State regulation of corporate governance is regulation of entities whose very existence and attributes are a product of state law." 755 F. Supp. 2d at 878 (quoting *CTS*, 481 U.S. at 89). Based on its review of those cases and circuit cases applying them, the *National Century* court determined that "[t]he key inquiry is whether the regulation would control conduct occurring wholly outside the state's boundaries." 755 F. Supp. 2d at 879.

In deciding against applying Ohio law, the *National Century* court noted neither the place of contract nor performance was Ohio, nor did any offer originate from Ohio. Rather, the connection to Ohio was solely based on the securities being issued by an entity organized under Ohio law. 755 F. Supp. 2d at 880. The court distinguished applying the Commerce Clause in *National Century* from other cases that rejected Commerce Clause challenges because in those cases "either the seller or buyer participated in the sale from the state of the challenged law." 755 F. Supp. 2d at 881.

The noteholders argued the conduct regulated by the Ohio Act was the fraud, which occurred in Ohio with Credit Suisse participating or aiding the fraud from outside the state. The *National Century* court rejected the argument, concluding the conduct regulated was the securities transaction, not the fraud. 755 F. Supp. 2d at 882. The court found support for this position in *Morrison*, 561 U.S. 247, which it characterized as announcing a "transactional test" that focused on the situs of the transaction, not the fraud. See *National Century*, 755 F. Supp. 2d at 883-84.

The *National Century* court held that "under the transaction test, the conduct being regulated by the Ohio Securities Act is the sale and purchase of securities. The sales between Credit Suisse and the Noteholders occurred wholly outside of Ohio; thus, applying [the Ohio Act] to the transactions would violate the extraterritoriality principle of the Commerce Clause." 755 F. Supp. 2d at 888.

I agree with much of the *National Century* analysis. But our case is distinguishable in one outcome-determinative regard—the securities here were sold directly by the Kansas LLCs for their own accounts. In *National Century*, Credit Suisse first purchased the securities and then later sold them to other purchasers through a second transaction. The fact that persons acting for the Kansas LLCs chose to execute the paperwork evidencing these transactions outside our territorial jurisdiction does not change the fact that the entities selling the securities and obligated under the agreements Lundberg and Elzufon signed were the Kansas LLCs for whom they acted. To the extent that any of the sales agreements were entered with someone other than a Kansas LLC, as some evidence suggests some offerings made by one of the California intermediaries may have been, then a different rule might apply. But for those executed by the Kansas LLCs, both the sale and offer occurred in Kansas under the KUSA and that suffices for jurisdiction over the persons who executed those agreements on behalf of the Kansas LLCs.

The LLCs were creatures of Kansas statute. They were party to the securities investment agreements, and they issued those securities. "Obviously, the power of a state to effect legal consequences is not limited to occurrences within the state if it has control over the status which gives rise to those consequences." *Alaska Packers Ass'n v. Industrial Acc. Com'n*, 294 U.S. 532, 541, 55 S. Ct. 518, 79 L. Ed. 1044 (1935). Thus, applying the KUSA here does not violate any federal constitutional restriction against extraterritorial application of Kansas law.

I would affirm the Court of Appeals for the reasons stated in this dissent.

BEIER and ROSEN, JJ., join the foregoing dissenting opinion.